JEROME L. LEVINE (Bar No. 038613)
FRANK R. LAWRENCE (Bar No. 147531)
DAVID M. GONDEN (Bar No. 154306)
**HOLLAND & KNIGHT LLP**
50 California Street, 28th Floor
San Francisco, California 94111
Telephone: (415) 743-6900
Facsimile: (415) 743-6910

Attorneys for Defendant
DRY CREEK RANCHERIA BAND
OF POMO INDIANS OF CALIFORNIA

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELISSA LORRAINE RUSS; KAREN CASILLAS; KATHERINE MARIE CASILLAS SOMERSALL; and YOLANDA CASILLAS SOMERSALL, <br><br> Plaintiffs, <br><br> vs. <br><br> DRY CREEK RANCHERIA BAND OF POMO INDIANS; DRY CREEK CASINO, LLC; a limited liability company; NEVADA GOLD & CASINOS, INC., a corporation; and DOES 1 to 50, inclusive, <br><br> Defendants. | Case No. <br><br><br> **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(b)** |

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE that defendant Dry Creek Rancheria Band of Pomo Indians of California ("Defendant") hereby removes to this Court the state court action described below.

1.     On May 2, 2006, an action was commenced in the Superior Court of the State of California in and for the County of Sonoma, entitled *Melissa Lorraine Russ; Karen Casillas; Katherine Marie Casillas Somersall; and Yolanda Casillas Somersall v. Dry Creek Rancheria Band of Pomo Indians; Dry Creek Casino, LLC; Nevada Gold & Casinos, Inc., and Does 1-50,*

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

– 1 –

Case No. 238609. A copy of said complaint as delivered to Defendant is attached hereto as Exhibit A.

2. The first date upon which Defendant received a copy of said complaint was May 11, 2006, when Defendant was purportedly served with summons and complaint. A copy of the summons is attached hereto as Exhibit B.

3. Defendant is a federally recognized Indian Tribe.

4. In this action Plaintiffs allege that Defendant, although a sovereign Indian nation immune from suit, is subject to suit because it provided a limited waiver of its sovereign immunity. *See* Complaint (Exhibit A) at paragraph 7.

5. The action seeks to compel defendant Tribe to pay various types of damages and take certain actions, and asks the court to declare that defendant Tribe holds certain interests in trust for Plaintiffs, in connection with the Tribe's federally-owned Indian lands. All this, despite Defendant's sovereign immunity.

6. Plaintiff's right to relief necessarily depends on resolution of the question of the scope and substance of a purported waiver of sovereign immunity of a federally recognized Indian tribe. This is a threshold jurisdictional question that arises under fundamental principles of federal common law including, for example, the federal common law principle that tribal waivers of sovereign immunity such as the one cited in Plaintiff's Complaint must be strictly limited to their terms and must be strictly construed. *See, e.g., Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58 (1978); *U.S. v. Mottaz,* 476 U.S. 834, 851 (1986); *U.S. v. Mitchell,* 445 U.S. 535, 538 (1980); *A.K. Management Co. v. San Manuel Band of Mission Indians,* 789 F.2d 785, 789 (9th Cir. 1986). "Tribal [sovereign] immunity is a matter of federal law." *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.,* 523 U.S. 751, 759 (1998).

7. This case also raises questions concerning rights related to federal lands held in trust by the federal government which are preemptively governed by federal la. *See, e.g.,* U.S. Const. art. 4, § 3, cl. 2; U.S. Const art. 1, § 8, cl. 3; *U.S. v. State of California,* 332 U.S. 19, 39 (1947). *See also Blackburn v. U.S.,* 100 F. 3d 1426, 1435 (9th Cir. 1996); *State of Nevada v. Watkins,* 914 F. 2d 1545, 1552-1553 (9th Cir. 1990).

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

– 2 –

Holland & Knight LLP
50 California Street, 28th Floor
San Francisco, CA 94111
Tel: (415) 743-6900
Fax: (415) 743-6910

8.      In short, this action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1331, and is one which may be removed to this Court by Defendant pursuant to the provisions of 28 U.S.C. § 1441(b) in that it arises under the Constitution and laws of the United States and removability appears on the face of the complaint.

9.      All other defendants who have been served with the Summons and Complaint join in this Notice of Removal, as evidenced by the separately filed consents to removal of defendant Dry Creek Casino, LLC and defendant Nevada Gold & Casinos, Inc.

10.      Defendant, including without limitation, its entities, officials, officers, agents, employees, and contractors, expressly reserves Indian sovereign immunity and all other rights and defenses.

## INTRADISTRICT ASSIGNMENT (Local Rule 3-5(b)

11.      This Notice is filed in the San Francisco Division since the state court action that is removed was filed in the Superior Court for the County of Sonoma.

Dated:  June 9, 2006                          HOLLAND & KNIGHT LLP

                                                                    Jerome L. Levine
                                                                    Frank R. Lawrence
                                                                    David M. Gonden
                                                                    Attorneys for Defendant
                                                                    DRY CREEK RANCHERIA BAND OF
                                                                    POMO INDIANS OF CALIFORNIA

– 3 –

NOTICE OF REMOVAL OF ACTION                                      Case No.
UNDER 28 U.S.C. § 1441(b)

1

## PROOF OF SERVICE

2 *MELISSA LORRAINE RUSS, et al. v. DRY CREEK RANCHERIA BAND OF POMO*

3 *INDIANS, et al.*

4 **USDC, NORTHERN DISTRICT OF CALIFORNIA, CASE NO.**

5    I, the undersigned, hereby declare that I am over the age of 18 years and not a party to the

6 above-captioned action; that my business address is 50 California Street, Suite 2800, San

7 Francisco, CA 94111-4624.

8    On June 9, 2006, the following document(s) were served:

9    **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(b)**

10

11 on the parties to this action at the following address(es):

12    **Richard Sax, Esq.**
   **Law Offices of Richard Sax**
13    **448 Sebastopol Avenue**
   **Santa Rosa, CA 95401**
14

15 ☒   (BY MAIL)  I caused a true copy of each document(s) to be placed in a sealed envelope
   with first-class postage affixed and placed the envelope for collection. Mail is collected daily at
16 my office and placed in a United States Postal Service collection box for pickup and delivery that
   same day.
17

18 ☐ (BY MESSENGER)  I caused a true copy of each document(s) to be delivered by hand to the
   office(s) of each addressee.
19

20 ☐ (BY FACSIMILE)  I caused a true copy of each document(s) to be transmitted by fax to the
   addressee(s) specifically identified as receiving a facsimile on the attached service list. The fax
21 machine used complied with California Rules of Court §2003(3) and no error was reported.

22    I declare under penalty of perjury under the laws of the United States that the foregoing is
   true and correct.
23

24    Executed June 9, 2006, at San Francisco, California.

25                          _____
26                                Patricia Giatis
27 # 3837460_v1

28

-4-

# EXHIBIT A

LAW OFFICES OF RICHARD SAX
State Bar Number 80632
448 Sebastopol Avenue
Santa Rosa, CA 95401
Telephone: (707) 525-1824
Facsimile: (707) 525-8119



ENDORSED
FILED

MAY 02 2006

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

Attorney for Plaintiffs,
Melissa Russ, Karen Casillas, Katherine Casillas, and Yolanda Somersall

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA

| | |
|---|---|
| MELISSA LORRAINE RUSS; KAREN CASILLAS; KATHERINE MARIE CASILLAS SOMERSALL; and YOLANDA CASILLAS SOMERSALL, <br><br> Plaintiffs, <br><br> vs. <br><br> DRY CREEK RANCHERIA BAND OF POMO INDIANS; DRY CREEK CASINO, LLC; a limited liability company; NEVADA GOLD & CASINOS, INC., a corporation; and DOES 1 to 50, inclusive, <br><br> Defendants. | No. 238608 <br><br> COMPLAINT FOR FRAUD AND DECEIT; BREACH OF WRITTEN CONTRACT; SPECIFIC PERFORMANCE; IMPOSITION OF CONSTRUCTIVE TRUST; CONVERSION, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, WRONGFUL EVICTION <br><br> UNLIMITED |

### PRELIMINARY ALLEGATIONS

Plaintiffs, MELISSA LORRAINE RUSS, KAREN CASILLAS, KATHERINE MARIE CASILLAS SOMERSALL, and YOLANDA CASILLAS SOMERSALL, allege:

## A. The Parties

1. At all times herein mentioned, plaintiffs MELISSA LORRAINE RUSS, KAREN CASILLAS, KATHERINE MARIE CASILLAS SOMERSALL, and YOLANDA CASILLAS SOMERSALL (hereinafter collectively known as "plaintiffs"), have been, and are, residents of Sonoma County, California, and members of defendant DRY CREEK RANCHERIA BAND OF POMO INDIANS.

2. Plaintiff Melissa Russ (hereinafter "Melissa") is a twenty-six year old wife and mother of three young boys. Melissa grew up on the Dry Creek Rancheria reservation. Melissa lived surrounded by extended family on the reservation, riding bikes and picking wildflowers with her cousins, and watching sunsets from the hills over the beautiful Alexander Valley.

3. Plaintiff Karen Casillas (hereinafter "Karen") also lived on the Dry Creek Rancheria reservation all of her life, where she owned a four-bedroom mobile home. Karen receives Social Security Disability Insurance because she is disabled due to severe asthma and diabetes. Karen requires a nebulizer machine, oxygen, and albuterol to manage her asthma, and injects insulin twice a day to control her diabetes.

4. Plaintiff Katherine Marie Casillas Somersall ("Katherine") is an adult daughter of Karen. Although a young woman, Katherine has developed asthma and high blood pressure since she moved off the reservation, and as a result of defendants' conduct described herein.

5. Plaintiff Yolanda Casillas Somersall ("Yolanda") is an adult daughter of Karen. Yolanda has been a Tribal member for 24 years on the Dry Creek Rancheria. She had a valid Assignment, and lived on the Rancheria in a mobile four-bedroom home.

6. Defendant DRY CREEK RANCHERIA BAND OF POMO INDIANS (hereinafter "Dry Creek Rancheria" or "Tribe") is, and at all times herein mentioned was, a federally recognized Indian tribe whose jurisdiction extends to all lands within

boundaries of the Dry Creek Rancheria reservation, located in Sonoma County, California.

7.      Pursuant to paragraph 17 of the Tribal Redevelopment and Relocation Agreement, the "…Tribe hereby waives its immunity from suit solely for and limited to the purpose of enforcing the payments due from Tribe hereunder, in any court of competent jurisdiction…" (See Tribal Redevelopment and Relocation Agreement, ¶ 17 [hereinafter "Agreement"], attached to this Complaint as Exhibit 1.)

8.      Defendant, DRY CREEK CASINO, LLC, an unincorporated association, (hereinafter "DRY CREEK CASINO" or "defendant"), is a limited liability company qualified to do business in California.

9.      Defendant, NEVADA GOLD & CASINOS, INC. (hereinafter "Nevada Gold & Casinos"), is a corporation qualified to do business in California.

10.     Plaintiffs are ignorant of the true names and capacities of defendants sued herein as DOES 1-50, inclusive, and therefore sue these defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.

11.     Plaintiffs are informed and believe and thereon allege that at all times herein mentioned, each of the defendants was the agent and employee of each of the remaining defendants, and in doing the things hereinafter alleged, was acting in the course and scope of such agency and employment.

## FIRST CAUSE OF ACTION
### (Fraud and Deceit)
### All Plaintiffs Against All Defendants

12.     Plaintiffs hereby incorporate by reference the Preliminary Allegations of this Complaint as though fully set forth herein.

.

## A.    Melissa

13.    In May of 2002, Melissa was made a participant in the Dry Creek Rancheria's housing relocation program, in return for her promise to move from her home and relocate. Defendants told Melissa that it was necessary for her to move because her home was located in an area of the Rancheria that was designated for Tribal economic redevelopment. Defendants needed to find available space for their gaming project, which includes a casino.

14.    On May 6, 2002, Melissa and defendants entered into a contract, the Tribal Redevelopment and Relocation Agreement, in which Melissa conveyed her right and interest in her residence in the Dry Creek Rancheria to the Tribe. In return, defendants promised in the Agreement, and repeatedly thereafter, to relocate Melissa to permanent Replacement Housing, and to provide for the purchase of such Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003. (See Tribal Redevelopment and Relocation Agreement, attached to this Complaint as Exhibit 1, and letter dated December 5, 2003, attached to this Complaint as Exhibit 2.)

15.    On December 5, 2003, a letter was sent to all plaintiffs in this action by Shirley Strehlow, Tribe Housing Director. The letter provides, in relevant part:

> "To: All Relocation Tribal Members
>
> "I would like this opportunity to clarify some misinformation regarding the purchase of homes for the relocated tribal members.
>
> "The families that moved off the reservation first, will be the families that will be contacted first to purchase a home—in that order. (First off the reservation, first into a home).
>
> "When it is your turn for a home purchase, I'll assist you in finding a home that meets your criteria and also the price range...

"The Board of Directors recently increased the maximum amount of money, for a 'modest replacement home' for you. This figure is up to $400k (Four hundred thousand dollars). This amount will include all the costs associated with the purchase of a home, such as inspections, documentation fees, closing costs, etc.

"Relocation payments to you will stop, when the agreed upon time with you and the tribe has ended and all documentation is in order for the purchase of your home.

"AS the Housing Director for Dry Creek Rancheria, I also hold a valid California Real Estate License. The Board of Directors has entrusted me with ensuring that the transactions on the purchase of the homes for the relocated members, is handled according to policy. I will be signing all documentation for the purchase of your properties, on behalf of Dry Creek Rancheria. The grant deed will be issued in the name of the <u>relocation tribal member,</u> at the close of escrow and when all paperwork is in order."

(See letter dated December 5, 2003, attached to this Complaint as Exhibit 2.)

16.    Melissa had just had a baby when defendants gutted her temporary house on the reservation.   Melissa was told by defendants to leave her belongings behind, because defendants would replace them. Melissa slept on a floor for several weeks.

17.    Melissa and her family found rental housing, and they have been exemplary tenants for approximately four years, keeping the rental house in good condition.

18.    On or about April 22, 2005, Harvey Hopkins, Tribal Chairman, sent a letter to all Relocation Tribal Members, including plaintiffs herein, that stated:

"Re: Relocation Living Expense

"Dry Creek Rancheria will make down payments on a variety of homes for relocation members. We will pay for all mortgage payments which include homeowners' insurance and property taxes until fully paid. We will also pay for property taxes for five years once the home is paid in full.

"Until you move into your home Dry Creek Rancheria will continue making payments to your landlord and you will receive the remaining balance of the $2,500.00. When moving into your new home living expenses will cease. We anticipate all relocation members to be in their home before the end of this year." (Emphasis added.)

(See letter dated April 22, 2005, attached to this Complaint as Exhibit 3.)

19.    On or about September 8, 2005, Melissa's landlord, Patty Winn, offered to sell Melissa the home she rented for $500,000. However, Ms. Winn needed to close the transaction by September 30, 2005. (See letter dated September 8, 2005, attached to this Complaint as Exhibit 4.)

20.    Melissa urgently requested a meeting with Harvey Hopkins, Tribal Chairman ("Hopkins"), and the Housing Director, to ask what was happening with the purchase of her home, since they hadn't telephoned Melissa to inform her of the status of the purchase of her home. Melissa asked the Tribe to fulfill their promises and contract and assist her in purchasing the rental home from her landlord. However, Hopkins told Melissa that defendants didn't have the money to pay Melissa so that she could purchase her rental home. Hopkins orally promised Melissa that they would extend Melissa's lease for one year, until they were able to pay Melissa so that she could buy a home. Melissa requested a letter of assurance to give to her landlord. Hopkins told Melissa to come on the following day and pick the letter up.

21.    The next day, Melissa returned and asked about the promised letter of assurance. Melissa was told that defendants would not put anything in writing, but that they would pay Melissa's rent until it was her turn to purchase a replacement home.

22.    On or about November 30, 2005, Hopkins sent Melissa a letter asking her to meet with the Board of Directors on December 15, 2005, to discuss her relocation eligibility and contract status. Melissa was told that the meeting was restricted to

herself, and was asked not to bring anyone else to the meeting with her. (See letter dated November 30, 2005, attached to this Complaint as Exhibit 5.)

23.     At the meeting with the Board of Directors and its attorney at the Tribal Office, which was very coercive and intimidating, Melissa was told that her contract had expired, that defendants had no legal obligation to Melissa anymore, that all relocation money would end in ninety days, and that Melissa would have to move. Melissa said that if she had known that this was going to happen, she would never have moved off the reservation. Hopkins told Melissa that he could just have her voted out of the Tribe.

24.     In a letter of on or about December 17, 2005, the Board of Directors of the Tribe thanked Melissa for her assistance in helping defendants find available space for the casino and gaming project, but alleged that three-year housing location period was ended. (See letter dated December 17, 2005, attached to this Complaint as Exhibit 6.)

25.     Melissa repeatedly called and visited the tribal office. On or about January 17, 23, 24, 25, 30, 31, and February 6, 2006, she attempted to obtain another meeting with the Board of Directors, to go over paperwork and discuss the status of her promised home. But she was repeatedly stalled, and her efforts were of no avail. Melissa has since requested and been denied any assistance by defendants.

26.     Melissa has suffered depression and a persistent abscess in her throat, conditions that she is informed and believes are due to the stress that she has undergone since she lost her home on the reservation. Her doctor has recommended that she take antidepressants. Her family has suffered also, and her children have expressed anxieties about becoming homeless.

**B.     Karen Joyce Somersall Casillas**

27.     In April of 2002, Karen was made a participant in the Dry Creek Rancheria's housing relocation program, in return for her promise to move from her home and relocate. Defendants told Karen that it was necessary for her to move because her home was located in an area of the Rancheria that was designated for Tribal economic

redevelopment. Defendants needed to find available space for its gaming project, which includes a casino.

28.      On April 22, 2002, Karen and the Tribe entered into a contract, the Tribal Redevelopment and Relocation Agreement, in which Karen conveyed her right and interest in her residence in the Dry Creek Rancheria to the Tribe. In return, the Tribe promised in the Agreement, and repeatedly thereafter, to relocate Karen to permanent Replacement Housing, and to provide for the purchase of such Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003. (See Tribal Redevelopment and Relocation Agreement, attached to this Complaint as Exhibit 7, and letter dated December 5, 2003, attached to this Complaint as Exhibit 2.)

29.      Karen told the Board of Directors of the Tribe that she did not wish to leave the reservation. On April 23, 2002, she moved into a temporary double-wide home on the reservation, and was promised permanent housing within eight weeks. Karen and her youngest daughter were taken by the housing director, Shirley Strehlow, to look at manufactured homes, and Karen picked one out.

30.      However, on or about March 11, 2003, Karen was given a Termination of Lease Agreement by the Board of Directors of the Tribe.

31.      On March 22, 2003, Karen was forced off the reservation by Coyote Valley tribal police and River Rock security, while a construction crew waited to demolish her home. It is Karen's information and belief that the site of her home became a parking lot for the casino.

32.      Karen was given three hours to move out of her home. She was forced to leave many of her possessions, which were demolished with her home.

33.      Karen and her youngest daughter were homeless from on or about March 22, 2003 to on or about April 6, 2003, and Karen lost her in-home health care benefits because she was homeless. Karen's daughter, Yolanda Casillas, provided in home care

for Karen, often watching Karen for 24 hours straight when she had difficulty breathing and was afraid to be alone on her breathing machine.

34.     Karen and her youngest daughter suffered the hardship and embarrassment of living in motels such as Motel 6 for approximately seven months. They spent approximately $4,000 a month upon necessities such as restaurants and laundry, basic expenses which increased due to their living in motels without kitchens and laundry facilities.

35.     On or about November 30, 2005, Hopkins sent Karen a letter asking her to meet with the Board of Directors on December 15, 2005, to discuss her relocation eligibility and contract status. Karen was told that the meeting was restricted to herself, and was asked not to bring anyone else to the meeting with her. (See letter dated November 30, 2005, attached to this Complaint as Exhibit 8.)

36.     At the meeting at the Tribal Office with the Board of Directors and its attorney, which was very coercive and intimidating, Karen was told that her contract had expired, that defendants had no legal obligation to her anymore, and that all relocation money would end in ninety days. Hopkins told Karen that he could just have her voted out of the Tribe.

37.     In a letter of on or about December 17, 2005, the Board of Directors of the Tribe thanked Karen for her assistance in helping the Tribe find available space for the casino and gaming project, but alleged that three-year housing location period was ended. (See letter dated December 17, 2005, attached to this Complaint as Exhibit 9.)

38.     Karen's health has suffered since she lost her home, and she has been in and out of hospitals for treatment of severe asthma and diabetes and related health problems. Katherine's youngest daughter has exhibited signs of sadness and depression, and has suffered social embarrassment because of her family's living situation.

C.     **Katherine Marie Casillas Somersall**

39.     In March of 2002, Katherine was made a participant in the Dry Creek Rancheria's housing relocation program, in return for her promise to move from her

home and relocate. The Tribe told Katherine that it was necessary for her to move because her home was located in an area of the Rancheria that was designated for Tribal economic redevelopment. The Tribe needed to find available space for its gaming project and a casino.

40.     On or about March 18, 2002, Katherine and the Tribe entered into a contract, the Tribal Redevelopment and Relocation Agreement, in which Katherine conveyed her right and interest in her residence in the Dry Creek Rancheria to the Tribe. In return, the Tribe promised in the Agreement, and repeatedly thereafter, to relocate Melissa to permanent Replacement Housing, and to provide for the purchase of such Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003. (See Tribal Redevelopment and Relocation Agreement, attached to this Complaint as Exhibit 10, and letter dated December 5, 2003, attached to this Complaint as Exhibit 2.)

41.     On or about November 30, 2005, Hopkins sent Katherine a letter asking her to meet with the Board of Directors on December 15, 2005, to discuss her relocation eligibility and contract status. Katherine was told that the meeting was restricted to herself, and was asked not to bring anyone else to the meeting with her. (See letter dated November 30, 2005, attached to this Complaint as Exhibit 11.)

42.     At the meeting with the Board of Directors and its attorney at the Tribal Office, which was very coercive and intimidating, Katherine was told that her contract had expired, that defendants had no legal obligation to her anymore, and that all relocation money would end in ninety days. Hopkins told Katherine that he could just have her voted out of the Tribe.

43.     In a letter of on or about December 17, 2005, the Board of Directors of the Tribe thanked Katherine for her assistance in helping the Tribe find available space for the gaming project, but alleged that three-year housing location period was ended. (See letter dated December 17, 2005, attached to this Complaint as Exhibit 12.)

44. Katherine has suffered stress-related health problems since she was forced to give up her home on the reservation.

**D. Yolanda Casillas Somersall**

45. In on or about March of 2002, Yolanda was called to have a meeting with the Board of Directors of Dry Creek Rancheria to discuss relocating off the Rancheria. Yolanda asked for a Relocation Agreement for herself, and revised and signed it. Katherine and the Tribe entered into a contract, the Tribal Redevelopment and Relocation Agreement, in which Katherine conveyed her right and interest in her residence in the Dry Creek Rancheria to the Tribe. In return, the Tribe promised in the Agreement, and repeatedly thereafter, to relocate Melissa to permanent Replacement Housing, and to provide for the purchase of such Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003.

46. Yolanda understood that signing the contract meant that the Tribe would use the land under her reservation home for a casino. The Tribe would demolish her home and replace it with another. Yolanda was prepared to find a rental until the Tribe purchased a new home for her. The Tribe told Yolanda that it was necessary for her to move because her home was located in an area of the Rancheria that was designated for Tribal economic redevelopment. The Tribe needed to find available space for its gaming project and a casino.

47. In 2002, Yolanda put her personal belongings in storage, where they remain today. Yolanda eventually moved in with her mother, Karen, becoming Karen's in-home health caregiver. Yolanda sometimes watched Karen for 24 hours straight, when Karen suffered severe asthma attacks and needed to use her breathing machine, and was afraid to be alone.

48. The Board of Directors of the Tribe changed members, and a new rule was passed that stated that two tribal members in the Relocation Program could not live together and each receive tribal discretionary funds for living expenses for relocating off the Rancheria for purposes of economic development. Yolanda was therefore no

longer able to live with Karen, and could no longer provide in-home health care for Karen. Yolanda had to leave her mother's home in on or about March of 2005, with nowhere to go.

49.     Although Yolanda had satisfactory references and credit, she had difficulty finding a rental. She was therefore left homeless, living in a motel for several months. She developed digestive problems due to high volumes of stress and not being able to eat regularly.

50.     In the first few months of being homeless, Yolanda contacted the Board of Directors to discuss their promises to purchase a home for her. Yolanda brought a quote of a home she wished to buy, but her request was denied because the Board of Directors told her there were no funds available for her.

51.     The Tribe had taken Karen and Yolanda to Lake County to view lots upon which they would place manufactured homes. Karen and Yolanda requested documentation of the idea, but were never given any. Approximately one month later, Yolanda asked the Tribe about the Lake County lots, but was told that the lots were not zoned residential, only commercial.

52.     In the meantime, Yolanda was homeless. Several months later, Yolanda received the April 22, 2005 letter in which Harvey Hopkins, Tribal Chairman, stated, "We anticipate all relocation members to be in their home before the end of this year. "

53.     On or about November 30, 2005, Hopkins sent Yolanda a letter asking her to meet with the Board of Directors on December 15, 2005, to discuss her relocation eligibility and contract status. Yolanda was told that the meeting was restricted to herself, and was asked not to bring anyone else to the meeting with her. (See letter dated November 30, 2005, attached to this Complaint as Exhibit 13.)

54.     At the December 15, 2005 meeting with the Board of Directors and its attorney at the Tribal Office, which was very coercive and intimidating, Yolanda was given the information that the Tribe was not going to fulfill her contract.

55.     In a letter of on or about December 17, 2005, Yolanda received a final letter from the Board of Directors of the Tribe stating that her contract with the Tribe would not be honored. The letter from the Board of Directors nevertheless expressed thanks to Yolanda for the "available space" upon which to build the casino and gaming project. (See letter dated December 17, 2005, attached to this Complaint as Exhibit 14.)

**E.     All Plaintiffs**

56.     At the time defendants made the promises to plaintiffs, defendants had no intention of performing them.

57.     Plaintiffs, at the time these promises were made and at the time plaintiffs took the actions herein alleged, were ignorant of defendants' secret intention not to perform, and plaintiffs could not, in the exercise of reasonable diligence, have discovered defendants' secret intentions.

58.     These promises were made by defendants with the intent to induce plaintiffs to move and enter into a contract, the Tribal Redevelopment and Relocation Agreement, in which plaintiffs conveyed their rights and interests in their assignments and/or homes in the Dry Creek Rancheria to the Tribe, because plaintiffs' homes were located in an area of the Rancheria that was designated for Tribal economic redevelopment. The Tribe needed to find available space for its gaming project and a casino.

59.     In reliance on the promise of defendants, plaintiffs entered into the contracts, the Tribal Redevelopment and Relocation Agreements, and conveyed their rights and interests in their assignments and/or homes in the Dry Creek Rancheria to the Tribe.

60.     In return, the Tribe promised in the contracts, and repeatedly thereafter, to relocate plaintiffs to permanent Replacement Housing, and to provide for the purchase of such Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003.

61.     On or about November 30, 2005, Hopkins sent plaintiffs a letter asking them to meet with the Board of Directors on December 15, 2005, to discuss their relocation eligibility and contract status. Plaintiffs were told that the meeting was restricted to

themselves, and were asked not to bring anyone else to the meeting with them. (See letter dated November 30, 2005, attached to this Complaint as Exhibit 5.)

62.     At the meeting with the Board of Directors and its attorney at the Tribal Office, plaintiffs were told that their contracts had expired, and that the Tribe had no legal obligation to them anymore. All relocation money would end in ninety days, and plaintiffs would have to move.

63.     In a letter of on or about December 17, 2005, the Board of Directors of the Tribe thanked plaintiffs for their assistance in helping the Tribe find available space for the casino and gaming project, but alleged that three-year housing location period was ended. (See letter dated December 17, 2005, attached to this Complaint as Exhibit 6.)

64.     In reliance upon defendants, plaintiffs entered into the contracts, the Tribal Redevelopment and Relocation Agreements, conveyed their rights and interests in their assignments and/or homes in the Dry Creek Rancheria to the Tribe, and relocated from their homes on the Dry Creek Rancheria reservation.

65. Plaintiffs in fact placed confidence and reliance upon defendants, including the Board of Directors and Chairman of the Tribe, who held trusted positions and had a fiduciary duty to plaintiffs, who are members of the Tribe.

66.     Defendants have failed and refused and continue to fail and refuse to convey plaintiffs' property to them. Defendants knowingly and intentionally failed and refused to abide by their promises to relocate plaintiffs to permanent Replacement Housing, and to provide for the purchase of such Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003.

67.     Plaintiffs are informed and believe, and thereon allege, that, at the time defendants made promises to plaintiffs, defendants had no intention of performing them. Defendants did the acts herein alleged, and made these promises to plaintiffs, with the intent to deceive and defraud plaintiffs, so that defendants could thereby acquire and keep plaintiffs' property and assignment interests on the reservation all for themselves.

68.     Throughout the years, defendants repeatedly promised to perform, renewing their promises in periodic correspondence and in oral conversations.

69.     Had plaintiffs known of defendants' secret intention not to perform, plaintiffs would not have acted in reliance on defendants' promises. Melissa stated, at a meeting with the Board of Directors on December 15, 2005, that if she had known that defendants would claim that her contract had expired, the Tribe had no legal obligation to her anymore, and relocation money would end before she received her promised home, she would never have moved off the reservation.

70.     As a proximate result of defendants' wrongful conduct, plaintiffs have been damages in an unknown amount, according to proof.

71.     Melissa has suffered depression and a persistent abscess in her throat, conditions that she is informed and believes are due to the stress that she has undergone since she lost her home on the reservation. Her doctor has recommended that she take antidepressants. Her family has suffered also, and her children have expressed anxieties about becoming homeless.

72.     Karen's health has suffered since she lost her home, and she has been in and out of hospitals for treatment of severe asthma and diabetes and related health problems. Katherine's youngest daughter has exhibited signs of sadness and depression, and has suffered social embarrassment because of her family's living situation.

73.     Katherine has suffered stress-related health problems since she was forced to give up her home on the reservation.

74.     Due to high levels of stress and not being able to eat regularly, Yolanda has suffered problems in her digestive system and has experienced weight gain, anger, and depression. Yolanda, like all of the other plaintiffs in this action, is deeply hurt and frightened because she has no place that she can call "home."

75.     The casino and gaming project, a multi-million dollar investment of the Tribe, is located directly on top of the land where the homes of Melissa, Karen, Katherine, and Yolanda were located, leaving Yolanda and the other plaintiffs homeless.

Plaintiffs believed, and continue to believe, that they own and/or have rights to and interest in the subject real property.

76.     At the time defendants acquired and detained the property of plaintiffs through undue influence and fraud as described above, defendants were guilty of malice, oppression, reckless indifference, and a willful and conscious disregard for the rights of plaintiffs. The acts of defendant justify the awarding of exemplary and punitive damages.

## SECOND CAUSE OF ACTION

### (Breach of Written Contract)
### All Plaintiffs Against All Defendants

77.     Plaintiff hereby incorporates by reference the Preliminary Allegations and First Cause of Action of this Complaint as though fully set forth herein.

78.     Plaintiffs have performed all duties, promises, and obligations required of them, and all conditions precedent that plaintiffs agreed to perform in the written contracts as set forth in the Preliminary Allegations and First Cause of Action of this Complaint, and in the Tribal Redevelopment and Relocation Agreements, attached to this Complaint as Exhibits 1, 7, and 10.

79.     Under the terms of the written contracts, defendants were obligated to relocate plaintiffs to permanent Replacement Housing, and to provide for the purchase of such Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003.

80.     Defendants have failed and refused, and continue to fail and refuse, to provide for the purchase of such Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003.

81.     Defendants' failure and refusal to provide for the purchase of such Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003, constitutes a breach of the written contracts as set forth and

described in the Preliminary Allegations and First Cause of Action of this Complaint, and in the Tribal Redevelopment and Relocation Agreements, attached to this Complaint as Exhibits 1, 7, and 10.

82.    As a result of defendants' breach of the written contracts, plaintiffs have been damaged in an amount and sum according to proof.

## THIRD CAUSE OF ACTION
### (Specific Performance)
### All Plaintiffs Against All Defendants

83.    Plaintiffs hereby incorporate by reference the Preliminary Allegations and First and Second Causes of Action of this Complaint as though fully set forth herein.

84.    At the time plaintiffs and defendants entered into the oral agreements as set forth and described in Paragraphs 9 through 57 of the Preliminary Allegations of this Complaint, and the written Tribal Redevelopment and Relocation Agreements, attached to this Complaint as Exhibits 1, 7, and 10, the consideration plaintiffs were to pay under the Agreements was adequate, and the Agreements were just and reasonable as to defendant.

85.    Plaintiffs have performed all duties, promises, and obligations required of plaintiffs, and all conditions precedent that plaintiffs agreed to perform in the Agreements.

86.    Within the time prescribed by the Agreements, plaintiffs have paid the full consideration called for in the Agreements, and have been ready, willing, and able to pay the consideration to defendants.

87.    Under the terms of the Agreements, defendants were obligated to relocate plaintiffs to permanent Replacement Housing, and to provide for the purchase of permanent Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003.

COMPLAINT
*Russ, et al. v. Dry Creek Rancheria Band of Pomo Indians., et al.*

88.     Plaintiffs have demanded that defendants provide for the purchase of permanent Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003.

89.     Defendants have failed and refused, and continue to fail and refuse, to provide for the purchase of such Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003.

90.     Defendants' failure and refusal to provide for the purchase of such Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003, constitutes a breach of the Agreements.

91.     Plaintiffs have no adequate remedy at law to enforce the provisions of the agreements, other than specific enforcement of the Agreements.

92.     Plaintiffs are entitled to specific performance of the terms, conditions, and provisions of the agreements by court decree, among other things, ordering defendants to provide for the purchase of permanent Replacement Housing for plaintiffs up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003.

## FOURTH CAUSE OF ACTION
### (Imposition Of Constructive Trust)
### All Plaintiffs Against All Defendants

93.     Plaintiffs hereby incorporate the Preliminary Allegations and First, Second, and Third Causes of Action of this Complaint as though fully set forth herein.

94.     Since on or about May 6, 2002 (Melissa), on or about April 22, 2002 (Karen), on or about March 18, 2002 (Katherine), and on or about March of 2002 (Yolanda), in Sonoma County, California, defendants have become unjustly enriched to the detriment of plaintiffs for money in a sum according to proof, received from plaintiffs' interests and diverted or directed to defendants' use.

95.     No payment has been made by defendants to plaintiffs, although demand has been made, and there is now due and owing a sum according to proof, together with interest at the legal rate from the date of each act of unjust enrichment.

96.     By virtue of their fraudulent acts, defendants hold the real and personal property described above as a constructive trustee for plaintiffs' benefit.

97.     As a proximate result of defendants' wrongful conduct, plaintiffs have been damaged in an unknown amount, according to proof.

## FIFTH CAUSE OF ACTION
### (Conversion)
### All Plaintiffs Against All Defendants

**98.**     Plaintiffs hereby incorporate the Preliminary Allegations and First, Second, Third, and Fourth Causes of Action of this Complaint as though fully set forth herein.

99.     Defendants have taken property from plaintiffs as heretofore described and converted it to their own use.

100.     Plaintiffs have repeatedly demanded the return of the property, but defendants have failed and refused to return it to plaintiffs.

101.     As a proximate result of defendants' wrongful conduct, plaintiffs have been damaged in an unknown amount, according to proof.

## SIXTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress)
### All Plaintiffs Against All Defendants

102.     Plaintiffs hereby incorporate the Preliminary Allegations and First, Second, Third, Fourth, and Fifth Causes of Action of this Complaint as though fully set forth herein.

103.     Defendants retained a recognizable degree of control over the relocation process, and had the duty to use ordinary care. Defendants and/or their agents were informed and knew, or should have known, that plaintiffs could suffer serious injury

and damages, including severe emotional distress and mental suffering, because of defendants' breach of duty and lack of care.

104.    As a further proximate result of defendants' breach of duty, plaintiffs suffered severe emotional distress and mental suffering, all to their damage, including, but not limited to: serious injury and damages, loss of use of property, general damage, property damage, great mental and nervous pain and suffering, emotional distress, relocation costs, and increased rental costs. Plaintiffs are informed and believe and thereon allege that they have been damaged according to proof.

105.    As a further proximate result of defendants' omissions constituting a breach of duty, plaintiffs suffered severe emotional distress and mental suffering. Plaintiffs are informed and believe and thereon allege that they have been damaged according to proof.

106.    Melissa has suffered depression and a persistent abscess in her throat, conditions that she is informed and believes are due to the stress that she has undergone since she lost her home on the reservation. Her doctor has recommended that she take antidepressants. Her family has suffered also, and her children have expressed anxieties about becoming homeless.

107.    Karen's health has suffered since she lost her home, and she has been in and out of hospitals for treatment of severe asthma and diabetes and related health problems. Katherine's youngest daughter has exhibited signs of sadness and depression, and has suffered social embarrassment because of her family's homelessness and living situation.

108.    Katherine has suffered stress-related health problems since she was forced to give up her home on the reservation.

109.    Due to high levels of stress, Yolanda has suffered problems in her digestive system and has gained weight gain, anger, and depression. Yolanda, like all of the other plaintiffs in this action, is deeply hurt and frightened because she has no place that she can call "home."

110.    As a proximate result of defendants' wrongful conduct, plaintiffs have been damages in an unknown amount, according to proof.

## SEVENTH CAUSE OF ACTION
### (Wrongful Eviction)
**Karen Joyce Somersall Casillas Against All Defendants**

111.    Plaintiffs hereby incorporate the Preliminary Allegations and First, Second, Third, Fourth, Fifth, and Sixth Causes of Action of this Complaint as though fully set forth herein.

112.    On or about Thursday, March 20, 2003, the water in Karen's home on the Dry Creek Rancheria reservation was shut off by defendants. On or about Friday, March 21, 2003, Karen's electricity and sewage was shut off. On or about Saturday, March 22, 2003, construction workers woke Karen up, telling her they were there to demolish Karen's home and they were under the impression that everyone had vacated the premises.

113.    Representatives of defendants arrived at Karen's home, pressuring her to move out immediately. They told Karen that they had a resolution giving the Board of Directors of the Tribe the authority to do whatever it took to complete the casino project. Karen's daughter called the authorities.

114.    Sheriff Rangle arrives, and Karen explains that she is being illegally evicted from federal land, without a federal court order to evict. Karen's agreement with the Tribe was that this was a temporary home until a permanent modular was placed on the top of the reservation for her, to compensate her for moving from her land assignment for the casino site. Karen's contract stipulated that assignment would follow to wherever she was relocated on the Rancheria. She had a rental agreement that stated that either party had to give thirty (30) days' notice to vacate, and Karen's rent was paid until the end of March.

115.    Because the eviction was occurring on a Saturday, Sheriff Morris was unsuccessful in locating authorities to definitively answer the question of legal jurisdiction in this matter.

116.    Karen's home was under siege, with the Coyote Valley tribal police and River Rock security denying access to Karen's home. The Sonoma County Sheriffs reported that they would monitor the situation from "down the hill."

117.    At approximately 4:30 p.m. on or about March 22, 2003, Coyote Valley tribal police told Karen and her family that they must leave immediately, because they were costing too much money on behalf of the Tribe, because of the fees of the tribal police and the construction crew waiting to demolish Karen's home. Karen was then given three hours to move out of her home. She was forced to leave many of her possessions, which were demolished with her home.

118.    Karen and her youngest daughter were homeless from on or about March 22, 2003 to on or about April 6, 2003, and Karen lost her in-home health care benefits because she was homeless. Karen and her youngest daughter suffered the hardship and embarrassment of living in motels such as Motel 6 for approximately seven months. They spent approximately $4,000 a month upon necessities such as restaurants and laundry, basic expenses which increased due to their living in motels without kitchens and laundry facilities.

119.    It is Karen's information and belief that the site of her home became a parking lot for the casino.

120.    Karen's eviction from her home on the Dry Creek Rancheria reservation was wrongful, because it was based upon the facts and fraud alleged in the first cause of action of this Complaint.

////
////
////
////

# PRAYER

## FIRST CAUSE OF ACTION
### (Fraud and Deceit)
### All Plaintiffs Against All Defendants

1. For general damages in an amount according to proof;

2. For actual damages in a sum according to proof;

3. For compensatory damages in a sum according to proof at the time of trial;

4. For interest on the above sums at the legal rate;

5. For punitive damages in a sum sufficient to punish defendants;

## SECOND CAUSE OF ACTION
### (Breach of Written Contract)
### All Plaintiffs Against All Defendants

6. Legal damages by virtue of defendants' breach of written contracts in an amount according to proof;

7. For interest at the legal rate on the foregoing sum pursuant to Section 3336 of the Civil Code, from and after on or about May 6, 2002 (Melissa), April 22, 2002 (Karen), March 18, 2002 (Katherine), and on or about March of 2002 (Yolanda);

## THIRD CAUSE OF ACTION
### (Specific Performance)
### All Plaintiffs Against All Defendants

8. For an order decreeing that defendants provide for the purchase of permanent Replacement Housing up to $320,000, which was raised to $400,000 by the Tribe on or about December of 2003;

9. For compensation incidental to the decree of specific performance as set forth above, according to proof;

# FOURTH CAUSE OF ACTION
## (Imposition Of Constructive Trust)
### All Plaintiffs Against All Defendants

10.     For an order declaring that defendants hold plaintiffs' interests in trust for plaintiffs;

11.     For an order that defendants be compelled to convey plaintiffs' interests to plaintiffs;

12.     For actual damages in an amount according to proof;

13.     For compensatory damages in a sum according to proof at the time of trial;

14.     For interest on the above sums at the legal rate;

15.     For damages in the amount of all monies found owing to plaintiffs;

16.     For punitive and exemplary damages in a sum to be proven at Trial;

# FIFTH CAUSE OF ACTION
## (Conversion)
### All Plaintiffs Against All Defendants

17.     For damages in the value of property converted and the amount of all monies found owing to plaintiffs, according to proof;

18.     For damages in the amount of the funds converted in an amount according to proof;

19.     For compensatory damages in a sum according to proof at the time of trial;

20.     For damages for the proximate and foreseeable loss resulting from defendants' conversion in an amount according to proof;

21.     For damages for time and money properly expended in pursuit of the converted property in a sum according to proof;

22.     For interest on the above sums at the legal rate;

23.     For punitive damages in a sum sufficient to punish defendants;

# SIXTH CAUSE OF ACTION
## (Negligent Infliction of Emotional Distress)
### All Plaintiffs Against All Defendants

24. For actual damages in an amount according to proof;

25. For compensatory damages in a sum according to proof at the time of trial;

26. For interest on the above sums at the legal rate;


# SIXTH CAUSE OF ACTION
## (Wrongful Eviction)
### Karen Joyce Somersall Casillas Against All Defendants

27. For general damages in an amount according to proof;

28. For actual damages in a sum according to proof;

29. For compensatory damages in a sum according to proof at the time of trial;

30. For interest on the above sums at the legal rate;

31. For punitive damages in a sum sufficient to punish defendants;


# ALL CAUSES OF ACTION

32. For costs of suit herein incurred; and,

33. For such other and further relief as the court may deem proper.


Dated: May 1, 2006

RICHARD SAX
Attorney for Plaintiffs

COMPLAINT
*Russ, et al. v. Dry Creek Rancheria Band of Pomo Indians., et al.*

**EXHIBIT 1**

# TRIBAL REDEVELOPMENT AND RELOCATION AGREEMENT

This Tribal Redevelopment and Relocation Agreement ("Agreement") is entered into this 1st day of April, 2002 (the "Effective Date"), between the DRY CREEK RANCHERIA BAND OF POMO INDIANS, a federally recognized tribe ("Tribe") and MELISSA LORRAINE RUSS ("Relocation Member").

## RECITALS

WHEREAS, Tribe has lands, known as the Dry Creek Rancheria (hereinafter, the "Rancheria"), located in Sonoma County, California; and

WHEREAS, Relocation Member owns a Present Residence (as such term is defined below), which residence is located on the Rancheria and is Relocation Member's principal place of residence; and

WHEREAS, Tribe has identified and designated portions of the Rancheria for economic development and redevelopment programs, the results of which are intended to meet Tribal governmental funding needs, including funding of Tribal programs that address health care, elderly, education, environmental and other needs of the Tribe, its Rancheria and its Members; and

WHEREAS, the Relocation Member's Present Residence is located in an area of the Rancheria that is designated for such Tribal economic redevelopment and, therefore, it will be necessary for the Relocation Member to move into housing at another location ("Replacement Housing") if Tribe's economic development plans are to be fulfilled; and

WHEREAS, the Rancheria presently lacks sufficient alternative space or accommodations into which the Relocation Member can be relocated and, thus, relocation off the Rancheria will be necessary; and

WHEREAS, the parties find it in the best interest of the Tribe and its Members, including the Relocation Member, to provide Replacement Housing to the Relocation Member so that Tribal economic development projects can be realized; and

WHEREAS, Relocation Member is willing to be relocated to Replacement Housing on economic terms that will satisfy his or her current housing needs, and Tribe is willing to meet such economic terms in order to further its stated goals and achieve Tribal economic self-sufficiency; and

WHEREAS, the Tribe recognizes that moving off the Rancheria involves a significant life-style change for Relocation Member and therefore, notwithstanding the parties' agreement that Relocation Member move from the Rancheria as soon as reasonably practicable following execution hereof, Tribe seeks hereby to provide assurance that Relocation Member will have the right in the future to return to

Rental

permanent housing on the Rancheria and that there will be sufficient funds available with which to reestablish such housing.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, IT IS HEREBY AGREED AS FOLLOWS:

1.    Definitions.

   a)    "Initial Relocation Allowance" shall mean that portion of the Purchase Price comprising a one-time payment of up to $5,000 to cover expenses for immediate relocation on or about the date set forth in paragraph 2 below, plus such additional amounts as may be reasonably necessary to enable the Relocation Member to pay security, rental, utility and other deposits associated with obtaining rental housing and utility services, and other amounts, all as set forth in paragraph 4 below.

   b)    "Member" shall mean any enrolled member of voting age of the Tribe.

   c)    "Needs-Based Assistance Program" shall mean a program to be established by Tribe pursuant to which qualified Members may receive vouchers for the purchase of food, utilities and other basic life necessities.

   d)    "Present Residence" shall mean the residential structure located on the Rancheria and owned and/or occupied by the Relocation Member, together with all of such Member's right, title and interest in that portion of the Rancheria on which such structure is situated, including all claims of possession or occupancy in connection therewith, and including any assignments or entitlements granted to the Relocation Member pursuant to Article IX of the Tribe's Articles of Association or Tribal Ordinance No. 98-08-002, or any other Tribal law, policy, custom tradition, resolution or ordinance.

   e)    "Property Tax Allowance" shall mean that portion of the Purchase Price comprising a payment to cover property taxes on any Replacement Housing purchased by Relocation Member (not including accrued property taxes included among the closing costs), payable for up to five years from the date of purchase.

   f)    "Purchase Price" shall mean the aggregate amount payable by Tribe to Relocation Member in consideration of the sale, grant, conveyance, transfer and assignment by Relocation Member to Tribe of all of Relocation Member's right, title and interest, of whatever nature, in and to Present Residence, and shall comprise the Initial Relocation Allowance, the Relocation Allowance (but only to the extent paid directly to Relocation Member or applied toward lease payments made

Rental                                   -2-

pursuant to Paragraph 3 hereof), the Replacement Housing Allowance, and the Property Tax Allowance as set forth herein.

g)  "Relocation Allowance" shall mean that portion of the Purchase Price comprising a payment of $2500 per month, payable for a period not to exceed 36 months, in the form of cash, vouchers or a combination thereof in accordance with paragraph 3 below, to enable Relocation Member to pay for immediate replacement housing, whether in the form of rental housing or Replacement Housing, as such term is defined herein, or the purchase and financing of a manufactured home on the Rancheria, and the cost of food, utilities, and other basic necessities.

h)  "Relocation Housing Trust Fund" or "Fund" shall mean a fund held in trust by the Tribe for the benefit of Relocation Members to provide assurance that there will be funds with which to provide temporary or rental housing off the Rancheria, Replacement Housing, or permanent housing on the Rancheria, as the case may be, pursuant to the terms of this Agreement.

i)  "Replacement Housing" shall mean the residential property acquired by the Relocation Member in fee pursuant to this Agreement.

j)  "Replacement Housing Allowance" shall mean, for those Relocated Members who elect not to return to the Rancheria under Tribe's Master Housing Plan (as such term is defined in paragraph 13 hereof), that portion of the Purchase Price comprising up to a total of $320,000 for purchasing Replacement Housing off the Rancheria.

k)  "Tribe" shall mean the Dry Creek Rancheria Band of Pomo Indians.

2.  <u>Sale of Interest in and Vacation of Present Residence; Nature of Sale.</u>  For the Purchase Price stated herein, Relocation Member hereby agrees to sell, grant, convey, assign and otherwise transfer to Tribe, and Tribe agrees to purchase, assume, and otherwise accept the transfer and conveyance from Relocation Member, all of Relocation Member's right, title and interest, of whatever nature, in and to the Present Residence, and Relocation Member further agrees to vacate said Member's Present Residence on or before April 30, 2001. For purposes of this Agreement, the sale of Relocation Member's interest in the Present Residence shall be deemed to have occurred on the Rancheria in one sales transaction, irrespective of the manner or place of payment therefor.

3.  <u>Relocation Allowance.</u>

(a) Commencing on the first day of the month immediately following the month in which the Present Residence is vacated, and payable on the first day of each month thereafter for a period of up to 35 months, Tribe shall pay

Rental

to Relocation Member the equivalent of $2,500 per month ("Relocation Allowance"). If Relocation Member qualifies for Tribe's Needs-Based Assistance Program, Tribe may pay all or a portion of the Relocation Allowance, as appropriate, in the form of vouchers to cover the cost of food, utilities and other basic life necessities of Relocation Member. The Relocation Housing Allowance is provided as a component of the Purchase Price in an amount sufficient to enable Relocation Member to replace such Present Residence, which is currently provided by the Tribe to said Member at no cost to Relocation Member, with comparable rental housing off the Rancheria until such time as Relocation Member has identified and purchased, with the Replacement Housing Allowance portion of the Purchase Price, Replacement Housing, or has returned to the Rancheria pursuant to the terms of this Agreement, at no significant economic impact to Relocation Member. The Relocation Allowance shall not be subject to liens, deductions or other claims by the Tribe.

(b) The Relocation Allowance shall be paid each month in accordance with the terms of this Agreement, and such other terms as Tribe reasonably may require, as follows: (i) any portion of the Relocation Allowance that is to be applied to the payment of rent shall, following presentation to the Tribe of sufficient documentary evidence of a lease or rental agreement, be paid directly by the Tribe to the landlord thereunder; (ii) rent credits obtained from any deposits shall be deducted from the monthly payment of Relocation Allowance; (iii) in the event of an early purchase under paragraph 7 below, all or a portion of the Relocation Allowance amount shall be paid each month directly to any appropriate lender furnishing financing in connection with such early purchase; (iv) any balance of Relocation Allowance remaining each month after appropriate payments have been made to Relocation Member's landlord or lender, as the case shall be, or the entire Relocation Allowance in the case of Relocation Members relocating to modular units on the Rancheria, shall be paid directly to Relocation Member; (v) payments to the Relocation Member shall be made on the first day of the month; and (vi) payments to landlords or lenders shall be made on or about the due date established by the lease, rental agreement, or loan agreement.

(c) Relocation Member acknowledges and agrees that, notwithstanding anything set forth elsewhere herein to the contrary, it may become necessary for the Tribe, and the Tribe hereby reserves the right, to file a Form 1099 with the Internal Revenue Service to reflect all or a portion of the Purchase Price received by Relocation Member hereunder, including the Relocation Allowance.

(d) At Relocation Member's election, some or all of any balance remaining each month from the Relocation Allowance after payment of Relocation Member's rent may be held by Tribe in an account established for Relocation

Member's benefit, the funds in which account may be utilized by Relocation Member as a down payment toward the purchase of Replacement Housing.

4. <u>Initial Relocation Allowance</u>. In order to further assist Relocation Member in relocating off the Rancheria, Tribe shall provide as part of the Purchase Price a one-time payment to Relocation Member of sufficient funds, not to exceed $5,000, to cover rental deposits, security deposits, one month's rent, moving costs, appliances, furniture, utility deposits and other costs customarily and reasonably related to the move and establishment of a new residence (collectively, "Initial Relocation Allowance"). If Relocation Member qualifies for Tribe's Needs-Based Assistance Program, Tribe may pay all or a portion of the Initial Relocation Allowance, as appropriate, in the form of vouchers to cover immediate necessities of Relocation Member. That portion of the Initial Relocation Allowance relating to rental deposits, security deposits and one month's rent shall be paid directly to the landlord upon presentation to the Tribe on or about the date due of sufficient evidence of the amount due. All security deposits shall be assigned to, and deemed to be the property of, the Tribe.

5. <u>Establishment of Relocation Housing Trust Fund</u>. The transaction documents in connection with the financing and development of the Dry Creek temporary casino project (hereinafter, the "Project") provide for, among other things, funding in the amount of $1.8 million to meet certain tribal needs, including housing relocation purposes. In order to assure funding of all payments required to be made hereunder, including but not limited to the funds necessary to assure that, in the event Relocation Member elects to return to the Rancheria pursuant to the terms of this Agreement, he or she may do so, and, further, as the vehicle for dispensing such funds, the Tribe hereby establishes a Relocation Housing Trust Fund. The Fund shall be funded with such sums as the Tribe may receive from time to time that are not subject to use restrictions, and such other sums as may be borrowed by Tribe in connection with the permanent financing of the Project (hereinafter, the "Financing") to the extent necessary to meet the Tribe's obligations hereunder, and after the date on which the Project has been opened to the public for business (the "Commencement Date"), such additional amounts as may be determined by Tribe to be reasonable and sufficient based on Tribe's financial condition and goal of enabling the Fund to have no less than One Million Dollars ($1,000,000) available for building homes under Tribe's Master Housing Plan (as defined below) for those returning to the Rancheria. To the extent funding of the Relocation Housing Trust Fund is necessary to meet Tribe's obligations under this Agreement prior to funding of the Financing, Dry Creek Casino, LLC ("Developer"), Developer under that certain Development and Loan Agreement between the Tribe and Developer, dated as of August 26, 2001 ("Development Agreement"), shall advance as a

Rental

Development Advance (as such term is defined in the Development Agreement) such amounts.

6. <u>Replacement Housing Allowance</u>. Subject to paragraph 7 below, commencing 37 months after the Effective Date, or when housing sites become available on the Rancheria in accordance with Section 13, Tribe will provide to the Relocation Member as a component of the Purchase Price and at Relocation Member's election, either permanent housing on the Rancheria, or a final installment of the Purchase Price in the form of a one-time payment (or such multiple disbursements as may reasonably be required in order to effect the purchase of Replacement Housing) in the maximum amount of $320,000 ("Replacement Housing Allowance"), as such amount may be adjusted in accordance with percentage changes, if any, in the Consumer Price Index-Urban Consumers (Los Angeles-Anaheim-Riverside, California area; Base 1982-84=100), as published by the United States Department of Labor, Bureau of Labor Statistics, and which amount shall be used in connection with the purchase of Replacement Housing only; provided that, in the event that Relocation Member elects to purchase Replacement Housing pursuant to this Agreement, Tribe shall have received written notice of such election not later than six months prior to the expiration of this Agreement (i.e., not later than the 30th month after the Effective Date). The Replacement Housing Allowance shall be applied to the purchase deposit, down payment, and purchase price balance, as well as to any real estate taxes, loan fees, closing or related costs, moving expenses, or other costs, associated with purchasing the Replacement Housing. To the extent there is any balance of the $320,000 remaining after such costs, it may be used for any purpose related to improving or furnishing the Replacement Housing. The Replacement Housing Allowance, or so much as may be required to complete a pending step of the transaction, shall be deposited into escrow and released in accordance with the terms of this Agreement, or an escrow agreement that has been approved by Tribe, in connection with or upon closing of the sale transaction (the "Closing Date"). Notwithstanding anything expressed or implied herein to the contrary, Relocation Member acknowledges that Relocation Member's failure to either complete the purchase of Replacement Housing or return to replacement Tribal housing on the Rancheria prior to the expiration of the Relocation Member's second taxable year following the Effective Date's taxable year could result in additional recognition of gain under the Internal Revenue Code and, therefore Relocation Member expressly agrees that it will use its best efforts to identify and purchase Replacement Housing, or notify Tribe of Relocation Member's election to return to replacement Tribal Housing on the Rancheria not less than three months prior to such date, or October 1, 2004.

7. <u>Early Purchase Option</u>. At any time after the expiration of six (6) months from the Commencement Date, and provided the Tribe has sufficient assets,

Rental

-6-

in Tribe's reasonable determination, to support such election, Relocation Member may elect, but shall not be required, to purchase housing off the Rancheria. In the event Relocation Member elects to purchase a residence during such period, Tribe shall provide, as a component of the Purchase Price, all or a portion of the Relocation Housing Allowance, to be applied to a purchase deposit, down payment and all real estate taxes, loan fees, closing or related costs in connection with said purchase. Relocation Member shall cooperate with Tribe in obtaining financing, if necessary, to effectuate such purchase on commercially reasonable terms, including but not limited to providing such guaranties and/or encumbrances of the Replacement Housing or such other terms and conditions as may reasonably be required by a lender in connection with such financing. In any event, Tribe shall cause the financing of any portion of the purchase price of the Relocation Housing purchased pursuant to this section to be repaid in its entirety and all liens on the Relocation Housing to be released on or before the expiration of 36 months from the date hereof, provided that, Relocation Member acknowledges that any such balance that is financed shall be reduced each month to the extent of the Relocation Allowance paid by Tribe pursuant to Paragraph 3(b)(iii) hereof. In the event Relocation Member meets all necessary requirements to qualify for the Tribe's First Time Buyer's Program, both parties will work cooperatively to cause Relocation Member to be enrolled in such Program in connection with the purchase of the Relocation Housing.

8.  <u>Property Taxes</u>.  Tribe shall pay as a component of the Purchase Price all property taxes in connection with any residence purchased pursuant to this agreement, over a maximum aggregate period of 60 months ("Property Tax Allowance").

9.  <u>Relocation Member's Sole Responsibility</u>.  All arrangements for moving and obtaining Replacement Housing by Relocation Member shall be Relocation Member's sole responsibility, unless Tribe and Relocation Member shall expressly agree to the contrary.

10. <u>Title to Replacement Housing</u>.  Unless purchased under paragraph 7 hereof, all Replacement Housing off the Rancheria shall be purchased free and clear and in fee simple for and in the name of the Relocation Member or such other title as the Relocation Member shall designate.  Except for housing that may be constructed on the Rancheria, Tribe shall have no interest whatsoever in any Replacement Housing. Relocation Member may sell, assign, devise, encumber or otherwise deal with or dispose of such Replacement Housing as Relocation Member in his or her sole discretion shall determine. To the extent any such sale, assignment, encumbrance or other disposition results in a taxable event, Relocation Member shall be solely liable for any tax liability therefor and, further, Relocation Member shall indemnify and hold Tribe harmless from any such tax liability arising therefrom. Replacement Housing

obtained on the Rancheria (or in any development controlled by Tribe) shall
be subject to the terms and conditions of this Agreement, or such other
policies and laws of the Tribe related to holding and transferring real
property on the Rancheria or within the Tribe's jurisdiction.

11. <u>No Tribal Warranties</u>. Relocation Member shall do his or her own due
diligence with respect to all aspects of the Replacement Housing and the
transaction through which it is obtained, and Tribe shall have no obligations
or responsibility whatsoever with respect thereto, regardless of the degree, if
any, to which Tribe or any Tribal representative, agent, or attorney may be
involved in such transaction. Tribe makes no warranties or representations
whatsoever with respect to the Replacement Housing, including but not
limited to the condition of said premises or the status of title thereto, or any
aspect whatsoever of the transaction through which the Replacement
Housing is acquired, and Relocation Member so agrees and agrees to
indemnify and hold Tribe harmless in connection therewith. Relocation
Member further agrees to hold Tribe and its officers and members harmless
from any claims, liabilities, costs or damages arising from the purchase or
occupancy, or any other aspect whatsoever, of the Replacement Housing,
without limitation. Tribe's sole liability with respect to this Agreement, and
Relocation Member's sole remedy in connection herewith and any matter
whatsoever arising from this Agreement or the transaction contemplated
herein shall be and hereby is limited to Tribe's payment of the Purchase Price
as set forth herein. Tribe and Relocation Member believe this transaction has
no adverse tax consequences to either party, but should there be a final
determination that there is an adverse tax consequence to Relocation
Member, Tribe shall indemnify Relocation Member therefor, in which case
Tribe reserves the right to increase the Purchase Price to account for such
consequence. Notwithstanding the foregoing, Tribe shall not have an
obligation to indemnify Relocation Member if the adverse tax consequence
results from an act or omission of Relocation Member.

12. <u>Transfer of Rights to Present Residence</u>. Except for the rights set forth in
paragraph 13 below, effective upon moving off the Rancheria, Relocation
Member shall, and hereby does, sell, relinquish, give, transfer, and assign, to
Tribe, and Tribe hereby cancels, revokes and accepts, all of Relocation
Member's interests and claims, if any, in and to the Present Residence,
including but not limited to any Present Residence derived from any ancestor
or descendant of Relocation Member. Nothing herein shall be construed by
Tribe or any Tribal Member or officer as relinquishing or in any way affecting
or diminishing any other Tribal right or entitlement of Relocation Member,
including but not limited to any future per capita or other benefit to be
conferred on Tribal Members generally or Relocation Member elsewhere in
this Agreement.

13. <u>Return to Rancheria</u>. Notwithstanding the relinquishment of the rights set forth in paragraph 12, if, at any time after six months following the Commencement Date, Relocation Member shall desire to move back to the Rancheria, he or she shall have the right to do so provided member gives the Tribe not less than three months' advance written notice of such intent, and: 1) Relocation Member has not purchased Replacement Housing off the Rancheria; 2) the Rancheria housing is to be Relocation Member's primary and permanent residence; and 3) a building site on the Rancheria is available for such residence in accordance with the Tribe's Master Housing Plan, as described in the next sentence. The Tribe shall adopt a plan for providing housing sites on the Rancheria ("Master Housing Plan"), which shall provide that up to five housing sites for Relocation Members who desire to live on the Rancheria shall be made available within six months following the Commencement Date, and up to nine additional housing sites for Relocation Members who desire to live on the Rancheria shall be made available within five years of the signing of this Agreement, and shall continue to make such sites available as provided in the Master Housing Plan. Selection and location of a particular housing site for said Relocation Member shall be within Tribe's sole discretion in accordance with the Master Housing Plan. If there are fewer sites available than can meet the demand, Tribe shall assign such sites on the basis of the applicant's prior length of Rancheria residency, with the longest residency being given the highest priority, and otherwise on an equal basis. The funds for assisting members in returning to the Rancheria shall be drawn from the Relocation Housing Trust Fund or such other source as Tribe may deem appropriate, in its sole discretion, to accommodate any use restrictions that may exist with respect to such funds. The Housing Purchase Allowance and other amounts to which Relocation Member is entitled hereunder in connection with the purchase of Relocation Housing may be applied by Tribe to the cost of development of such Rancheria residence. Notwithstanding Relocation Member's timely furnishing of notice hereunder, in no event shall Tribe be obligated to relocate Relocation Member back to the Rancheria prior to the expiration of 36 months if, in Tribe's reasonable determination, the Project is not generating sufficient cash flow to support development of the Tribe's Master Housing Plan and, further, Tribe reserves the right to place Relocation Members who desire to return to the Rancheria in tribal housing off the Rancheria if such tribal housing is contemplated under the terms of Tribe's Master Housing Plan.

14. <u>Payments and Guarantees</u>. Tribe agrees to pay the Purchase Price provided herein to the extent it has funds to do so in the Relocation Housing Trust Fund. In the event funds in the Relocation Housing Trust Fund are insufficient to meet any portion of the Purchase Price required to be paid prior to funding of the Financing (as defined in paragraph 5 hereof), Developer will guarantee payment of such deficient amounts necessary to

fund such portion. Developer shall execute this Agreement to the extent necessary to memorialize such guaranty.

15. <u>Integrated Agreement; Successors, Heirs and Assigns</u>. This Agreement constitutes the entire and integrated agreement between the parties and all prior and contemporaneous negotiations, representations and agreements, written or oral, if any, between the parties with regard to the subject matter of this Agreement are superseded and canceled hereby and shall not be used to interpret or construe this Agreement. No amendment or other modification of this Agreement shall be effective or enforceable unless in writing duly signed by Tribe and Relocation Member. This Agreement shall be binding upon the successors, heirs and assigns of the parties, including but not limited to all successors of the Tribe's officers and members, and successors, heirs and assigns of Relocation Member.

16. <u>Hold Harmless and Indemnification</u>. It shall be Relocation Member's sole obligation, and Relocation Member hereby agrees to indemnify and hold harmless Tribe for any and all liability arising from Relocation Member's failure, to satisfy all notice and reporting requirements, if any, of relevant governmental agencies in connection with public benefit programs under which Relocated Member receives benefits (e.g., CalWORKS, Medi-Cal, Veterans Benefits, etc.) as such notice and reporting requirements relate to payments received hereunder by Relocation Member as part of the Purchase Price.

17. <u>Federal Approval; Limited Waiver of Immunity</u>. The parties hereto acknowledge and agree that this Agreement may require approval by the Secretary of the Interior in order to be valid and enforceable and may constitute a divestiture of Relocation Member's interest in Indian lands. Either party may seek such approval at any time and the other party shall cooperate with such effort. In the event the document is not approved, the parties shall negotiate in good faith to make such changes to this document as may be necessary to obtain approval and preserve the intentions and agreements set forth herein. Notwithstanding the foregoing, Tribe hereby waives its immunity from suit solely for and limited to the purpose of enforcing the payments due from Tribe hereunder, in any court of competent jurisdiction; provided that this waiver is expressly revoked following the Closing Date, and shall no longer be of any force or effect.

Executed on the Dry Creek Rancheria effective April ___, 2002.

RELOCATION MEMBER:

Rental                                    -10-

By: _MELISSA LORRAINE RUSS_ (signature)
MELISSA LORRAINE RUSS

## DRY CREEK RANCHERIA BAND OF POMO INDIANS

By: _(signature)_
LIZ ELGIN DEROUEN, Chairperson

By: _(signature)_
BETTY ARTERBERRY, Vice-Chair

By: _(signature)_
MARGE ROJES, Secretary/Treasurer

By: _(signature)_
GABE NEVAREZ, Member at Large

By: _(signature)_
~~MATTHEW MANUEL, Member at Large~~
LEONA MALDONADO, Member at Large

*Signatures continued on next page*

Dry Creek Casino, LLC, "Developer" hereunder, hereby expressly covenants and agrees to the terms of the foregoing Agreement, including with particularity Developer's affirmative obligations as set forth in paragraphs 5 and 14 hereof.

DRY CREEK CASINO, LLC a
Texas limited liability company

By: _____

    H. Thomas Winn
    Manager

LAX1 #212569 v2