Richard Sax, Esq. (SBN 80632) *Richard@rsaxlaw.com*
LAW OFFICES OF RICHARD SAX
448 Sebastopol Avenue
Santa Rosa, CA  95401
Telephone:  (707) 525-1824
Facsimile:  (707) 525-8119
Michael Biggs, Esq. (SBN 237640)
BIGGS LAW PC
P. O. Box 454
Petaluma, CA 94953-0454
Telephone: 707-763-8000
Facsimile: 707-763-8010
Attorneys for Plaintiffs, Melissa Lorraine Russ, et al.

Jerome L. Levine, Esq. (SBN 038613)
Frank R. Lawrence, Esq. (SBN 147531)
David M. Gonden, Esq. (SBN 154306)
HOLLAND & KNIGHT LLP
50 California Street, 28th Floor
San Francisco, California 94111
Telephone: (415) 743-6900
Facsimile:  (415) 743-6910
Attorneys for Defendant, Dry Creek Rancheria Band of Pomo Indians

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELISSA LORRAINE RUSS, et al.<br><br>Plaintiffs,<br><br>vs.<br><br>DRY CREEK RANCHERIA BAND OF POMO INDIANS, et al.<br><br>Defendants. | Case No. C 06-03714  CRB<br><br>UPDATED JOINT CASE MANAGEMENT STATEMENT AND ~~PROPOSED~~ ORDER; DEFENDANT'S REQUEST TO CONTINUE CASE MANAGEMENT CONFERENCE<br><br>**ORDER** |

1

The parties to the above-entitled action jointly submit this Updated Case Management Statement and Proposed Order and request the Court to adopt it as its Updated Case Management Order in this case.

## DESCRIPTION OF THE CASE

**1. A brief description of the events underlying the action:**

**Plaintiffs contend:**

Plaintiffs Melissa Lorraine Russ, Karen Casillas, Katherine Marie Casillas Somersall, and Yolanda Casillas Somersall ("Melissa," "Karen," "Katherine," "Yolanda," or, collectively, "plaintiffs"), bring this action against defendant Dry Creek Rancheria Band of Pomo Indians ("Tribe") for breach of contract.

This action arises from the grossly unjust, arbitrary, and capricious refusal of the Tribe to honor the Tribal Redevelopment and Relocation Agreements ("Agreements") signed by the parties in March, April, and May of 2002.

This is a breach of contract case, since the tribe executed a limited waiver of immunity regarding enforcement of the Relocation Agreements.

Plaintiffs, documented members of the Tribe and lifelong residents on the Dry Creek Rancheria reservation ("reservation"), conveyed their rights, titles, and interests in their residences and assignments on the reservation to the Tribe, in reliance upon promises by the Tribe to purchase Replacement Housing up to $320,000, which was raised to *$400,000* by the Tribe in December of 2003. A letter dated December 5, 2003, sent to "All Relocation Tribal Members" from Tribal Housing Director Shirley Strehlow, stated: "The Board of Directors recently increased the maximum amount of money, for a 'modest replacement home' for you. This figure is <u>up to $400k</u> (Four hundred thousand dollars)." (See Exhibit 2 to plaintiffs' First Amended Complaint.)

By moving off the reservation, even through they did not wish to move, plaintiffs contributed to the economic well-being and greater good of the Tribe.

Plaintiffs' assignments were valuable real property hereditary interests, which plaintiffs could have and did transfer to and share with their heirs.

The Tribe entered into the Agreements because it sought space on the 75-acre Alexander Valley reservation for its gaming project, parking garage, and casino, now known as "River Rock Casino." Plaintiffs' homes and assignments were located on reservation land designated by the Tribe for economic redevelopment.

Since 2002, the Tribe has told plaintiffs to wait their turn to obtain Replacement Housing. Nineteen others have received Replacement Housing, but plaintiffs are still waiting.

The Tribe also promised that plaintiffs would be able to move back on the reservation as an alternative to purchasing them a new house, but the Tribe has not provided any housing or housing plan, and the Board of Directors of the Tribe has told plaintiffs that it won't honor their Agreements at all.

Plaintiffs only wish to live peacefully in their relocation homes, and only want to be treated like the nineteen others who received relocation homes. No more, no less.

### A. The Tribe Signed A Limited Waiver of Immunity

In paragraph 17 of the Agreements, the Tribe "...waives its immunity from suit solely for and limited to the purpose of enforcing the payments due from the Tribe thereunder, in any court of competent jurisdiction; providing that the waiver was expressly revoked following the Closing Date..."

### B. The Agreements, Pursuant To Their Own Terms, Have Never Expired

Paragraph 6 of the Agreements defines the "Closing Date" as "...upon closing of the sale transaction (the 'Closing Date')." Thus, the Agreements have never expired and are still viable.

### C. Plaintiffs Repeatedly Attempted To Exercise Their Rights Under The Agreements, And Were Told To Wait Their Turn Or Wait Until The Tribe Had The Money

Defendant cites paragraph 9 of the Agreements to support its argument that "All arrangements for...obtaining Replacement Housing by Relocation Member shall be Relocation Member's sole responsibility, unless Tribe and Relocation Member shall expressly agree to the contrary." (See ¶ 9 of Tribal Redevelopment and Relocation

Agreements, attached as Exhibits 1, 7, 10, and 13 to plaintiffs' First Amended Complaint.)

Plaintiffs and the Tribe did in fact agree to the contrary, in that the Tribe told each of them to wait their turn, and that houses would be provided as money allowed. In addition, the Tribe offered to assist plaintiffs in the actual mechanics of purchasing replacement homes, and assured plaintiffs that the transactions on the purchase of replacement homes would be handled according to tribal policy. A letter dated December 5, 2003 from Tribal Housing Director Shirley Strenhlow advised "All Relocation Tribal Members":

> "The families that moved off the reservation first, will be the families that will be contacted first to purchase a home—in that order. (First off the reservation, first into a home).
>
> "When it is your turn for a home purchase, I'll assist you in finding a home that meets your criteria and also the price range. Please make sure I have your current home or cell phone number...
>
> "As the Housing Director for Dry Creek Rancheria, I also hold a valid California Real Estate License. The Board of Directors has entrusted me with ensuring that the transactions on the purchase of the homes for the relocated members, is handled according to policy. I will be signing all documentation for the purchase of your properties, on behalf of Dry Creek Rancheria. The grant deed will be issued in the name of the <u>relocation tribal member</u>, at the close of escrow and when all paperwork is in order."

(See letter from the Tribe to plaintiffs dated December 5, 2003, attached as Exhibit 2 to plaintiffs' First Amended Complaint.)

Plaintiffs dutifully approached the Tribe with various houses that they wished to purchase. For instance, on September 8, 2005, Melissa's landlord, Patty Winn, offered to sell Melissa's rental home to her for $500,000. However, Ms. Winn needed to close the

transaction by September 30, 2005. (See letter dated September 8, 2005, attached to plaintiffs' Complaint as Exhibit 4.)

Melissa urgently requested meetings with Harvey Hopkins, Tribal Chairman ("Hopkins"), and with the tribal Housing Director. Melissa wished to ask what was happening with the purchase of her relocation home, since the Tribe hadn't telephoned Melissa to inform her of her relocation purchase status. Melissa asked the Tribe to assist her in purchasing a replacement home from her landlord pursuant to the Agreement and the Tribe's promises.

Hopkins told Melissa that defendants didn't have the money to pay Melissa so that she could purchase her rental home. Hopkins orally promised Melissa that they would extend Melissa's lease for one year, until they were able to pay Melissa so that she could buy a replacement home. Melissa requested a letter of assurance to give to her landlord. Hopkins told Melissa to come on the following day and pick the letter up.

The next day, Melissa returned and asked about the promised letter of assurance. Melissa was told that the Tribe would not put anything in writing, but that it would pay Melissa's rent until it was her turn to purchase a replacement home.

Melissa repeatedly called and visited the tribal office. On January 17, 23, 24, 25, 30, 31, and February 6, 2006, she attempted to obtain a meeting with Hopkins and the Board of Directors, to go over paperwork and discuss the status of her promised home. But she was repeatedly stalled, and her efforts were of no avail.

Karen initially told the Board of Directors of the Tribe that she did not wish to leave the reservation. However, on April 23, 2002, she moved into a temporary double-wide home on the reservation, and was promised permanent housing within eight weeks. Karen and her youngest daughter, a minor, were taken by the housing director, Shirley Strehlow, to look at manufactured homes, and Karen picked one out.

In 2002, Yolanda, an adult daughter of Karen, put her personal belongings in storage, where they remain today. Yolanda eventually moved in with Karen, who is disabled, becoming Karen's in-home health caregiver. Yolanda sometimes watched

Karen for 24 hours straight, when Karen suffered severe asthma attacks and needed to use her breathing machine, and was afraid to be alone.

The Board of Directors of the Tribe changed members, and a new rule was passed that stated that two tribal members in the Relocation Program could not live together and each receive tribal discretionary funds for living expenses for relocating off the reservation for purposes of economic development. Yolanda was therefore no longer able to live with Karen, and could no longer provide in-home health care for her mother. Yolanda had to leave her mother's home in on or about March of 2005, with nowhere to go.

Yolanda was left homeless, living in a motel for several months. In the first few months of being homeless, Yolanda contacted the Board of Directors to discuss their promises to purchase a home for her. Yolanda brought to the Tribe purchase price information regarding a home she wished to buy, but her request was denied because the Board of Directors told her there were no funds available for her.

The Tribe had already taken Karen and Yolanda to Lake County to view lots upon which it said it would place manufactured homes. Karen and Yolanda requested documentation in support of the idea, but were never given any. Approximately one month later, when Yolanda asked the Tribe about the Lake County lots, she was told that the lots were zoned commercial, not residential.

In the meantime, Yolanda remained homeless. Several months later, Yolanda received the April 22, 2005 letter in which Hopkins stated to plaintiffs, "We anticipate all relocation members to be in their home before the end of this year." (See letter from the Tribe to plaintiffs dated April 22, 2005, attached as Exhibit 3 to plaintiffs' First Amended Complaint.)

**D.  Plaintiffs Have Attempted To Exhaust Their Tribal Remedies**
Plaintiffs' efforts at Tribal Council meetings on December 9, 2006 and September 9, 2006, together with their previous efforts to obtain Tribal hearings in this matter, satisfy requirements to exhaust Tribal remedies before proceeding with this litigation.

1.    **Plaintiffs And Their Counsel Spoke At A Tribal Council Meeting On December 9, 2006, But Were Told That The Matter Could Not Be Voted Upon Because There Was No Quorum**

Plaintiffs and their counsel spoke to a Tribal Council meeting on December 9, 2006, where plaintiffs were told that the lack of a quorum prevented this matter from being voted upon.

**Defendant Dry Creek Rancheria Band of Pomo Indians contends:**

This is an intramural dispute between the Tribe and four of its approximately 900 members, centered on a tribal Housing Relocation Program ("Program"). The Program assisted tribal members who were living on the Tribe's reservation at the time the Tribe was constructing its government owned and operated casino project ("Project"). The Project was needed to fund essential tribal government programs that address health care, senior support services, education, environmental and other needs of the Tribe and its members. Congress expressly endorsed Indian tribes operating gaming projects "as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). Federal Indian policy has strongly promoted these virtues. Thus the Tribe's decision to embark on its Project was undertaken in furtherance of substantial tribal governmental needs and expressly endorsed by Congress through the Indian Gaming Regulatory Act of 1988, 25 U.S.C. §§ 2701-21.

Because the Tribe's reservation is located on a small parcel of land consisting mostly of steep hillsides, and because federal law limits the Tribe to only having a casino on its reservation, *see* 25 U.S.C. § 2710 (d)(1) ("class III gaming activities shall be lawful on Indian lands"), in order to construct the project, the Tribe needed to use the land on which certain tribal housing was located. Thus the Tribe had no choice but to vacate certain tribal housing.

In a voluntary effort to minimize the burdens on tribal members then living on the reservation, which the Tribe provided at no cost to the members, the Tribe's General Council authorized the creation of the Program. The Program included payment of a "Purchase Price" which consisted of four potential categories of tribal governmental benefits to members who moved out of tribal housing on the reservation:

(1) an "Initial Relocation Allowance" of up to $5,000 to "cover expenses for immediate relocation (including reimbursement for moving expenses, security, rental, utility and other deposits);

(2) a "Relocation Allowance" of $2,500 per month for up to 36 months for housing expenses;

(3) a "Replacement Housing Allowance" of up to $320,000 to buy off-reservation replacement housing; and

(4) a "Property Tax" benefit covering property taxes on homes purchased under the Program for up to five years.

The Tribe paid benefits under the Program for these four individual plaintiffs – Melissa Russ and Karen Casillas and her two daughters – totaling more than half a million dollars. The Program gave tribal members an opportunity to elect either to ultimately return to tribal housing on the reservation if and when such housing became available, or alternatively, to seek permanent replacement housing off the reservation. A total of 28 tribal members participated in the Housing Relocation Program, 19 of whom successfully purchased permanent replacement homes off of the Reservation through the Program. Nine additional tribal members received substantial housing assistance through the Program, but did not purchase homes. The plaintiffs are among this group.

The agreements at issue here made plain their intent that the purchase of replacement housing off of the reservation, if any, was to be concluded within three years following their execution and were restricted to a limited term. The agreements

also required that tribal members seeking the "Replacement Housing Allowance" give the Tribe timely written notice of the member's election. The plaintiffs, if they made this request at all, did so a year after their contractual rights under the Program expired, and did not do so in writing as expressly required by the Agreements. The Agreements further provided that the member, not the Tribe, is solely responsible for obtaining permanent off-reservation housing. The Program was created for the specific, limited purpose of replacement housing for members displaced from the reservation, not as simply a cash windfall to the relocated tribal members. The Plaintiffs failed to timely pursue the benefits provided them under the Program and the Agreements, both of which expired long before this suit was filed.

**Procedural Status Since Last Case Management Conference**

Since the last Case Management Conference, on October 27, 2006, the parties appeared and participated in good faith for approximately six hour at the settlement conference before Magistrate Judge Chen. No settlement was reached. However, as a result of the conference before Judge Chen and the recently completed Tribal Council meeting, the parties are continuing to confer with Judge Chen who is assisting the parties in evaluating different settlement possibilities.

With respect to the current case status and the plaintiffs' exhaustion of their tribal remedies, Defendant believes the following are relevant to this case at this stage:

**A December 9, 2006 Special Tribal Council Meetings was Noticed Specifically to Address Plaintiffs' Claims**

The defendants voluntarily scheduled a special meeting of the Tribal Council for December 9, 2006. Although there were other matters on the agenda, defendants called this special meeting in large part to provide plaintiffs' with an opportunity to present their claims and ask the Tribal Council for the relief they seek. Defendants did not ask plaintiffs to cover any of the costs for this special meeting.

At the December 9 Tribal Council meeting, a quorum was not established, and thus the meeting was for informational purposes only. The plaintiffs and their legal counsel discussed their case with the Tribal Council, as did the Tribe's legal counsel. Since a quorum was not established, the Tribal Council was not able to render a decision on plaintiffs' request to reinstate any relocation benefits under the now expired relocation agreement.

Plaintiffs will have a further opportunity to present their case and request relief at the regularly scheduled April 2007 Tribal Council meeting. Since this is one of the two annual meetings mandated by the Tribe's Articles of Association, a quorum of tribal members is usually present. In addition, to further the plaintiffs' issue and other matters the Tribe must consider prior to the bi-annual meeting in April, a further Special Tribal Council meeting may be called where a quorum may be present to consider the plaintiffs' request prior to the regularly scheduled April meeting. Under these circumstances, the Tribe requests the current stay remain in place so that the plaintiffs may exhaust their tribal remedies as required under the Ninth Circuit precedents cited in defendants' brief in support of their motion to dismiss the original complaint.

**Exhaustion of Tribal Remedies**

Plaintiffs still contend that it is futile to require them to exhaust their tribal remedies. They are wrong.

Futility exists only when the parties demonstrate unequivocally that the available tribal remedies cannot possibly yield the desired results. *See, e.g., White Mountain Apache Tribe v. Hodel*, 840 F.2d 675, 677-678 (9th Cir. 1988) (futility exists by virtue of a "preannounced decision by the final administrative decision-maker" or when there is "objective and undisputed evidence of administrative bias which would render pursuit of an administrative remedy futile" (citations omitted)); *Aleknagik Naatives Limited v. Andrus*, 684 F. 2d 496, 500-501 (9th Cir. 1980) (holding that requiring

administrative review of decisions relating to disposition of townsite land under the Alaska Native Claims Settlement Act would be futile because the Secretary of the Interior had made clear his position, administrative remedies would be inadequate in that the Interior Board of Land Appeals had previously indicated that it did not have jurisdiction to issue the relief which would be sought, and the agencies' interests in first hearing the matter was not substantial as the claims involved solely matters of statutory interpretation); *Ringer v. Schweiker*, 684 F.2d 643, 647 (9th Cir.1982) (ruling by Secretary of Health & Human Services that a type of operation was conclusively excluded from Medicare coverage made individual appeal to administrative agency futile).

Plaintiffs claim that waiting until the next regularly scheduled Tribal Council meeting in April, 2007, is too long. That position is wrong. The Tribe scheduled a Special Tribal Council meeting on December 9, 2006, for the purpose of allowing plaintiffs to raise their concerns directly with the Tribal Council. Plaintiffs took advantage of that opportunity to express their views to a significant number of tribal members. Although a quorum was not established, plaintiffs presentation nevertheless constituted a meaningful dialog within the tribal forum that has the authority to provide plaintiffs with the remedy they seek, and thus may prove foundational to a future meeting at which the Tribal Council may establish and quorum and take definitive action with respect to plaintiffs' concerns.

Moreover, a delay of mere months to request relief from the Tribal Council when a full quorum is present to hear and decide plaintiffs' request does not establish futility. In this regard, defendants direct the Court's attention to *Johnson v. Gila River Indian Community*, 174 F.3d 1032, 1036 (9th Cir. 1999), holding that "a two-year delay in the tribal appellate court" was not "sufficient to show that pursuing tribal remedies is futile." Thus waiting a maximum of three months until the April Tribal Council meeting does not establish futility.

For these reasons, defendants believes it makes sense to continue the Case Management Conference presently set for January 12, 2007, to a later date after the April 2007, Tribal Council meeting.

2.   **The principal factual issues which the parties dispute:**

**Plaintiffs:**

A.   Whether plaintiffs have exhausted their tribal remedies;

B.   Whether the Tribe gave notice to plaintiffs of any further Tribal remedies as to their claims;

C.   Whether the Tribe can assert that plaintiffs have not exhausted all tribal remedies if Tribal Council meetings continue to lack quorums;

D.   Whether a Tribal Council must ratify a decision of the Board of Directors to honor the Agreements;

E.   Whether the Board of Directors had the authority to enter into the Agreements;

F.   Whether the compensation offered plaintiffs in the Agreements is adequate and legal pursuant to the 1968 Indian Civil Rights Act.

**Defendant Dry Creek Rancheria Band of Pomo Indians:**

The Tribe disputes most or all of the "facts" plaintiffs allege and reserves all rights with respect thereto. The Tribe also refers the Court to its statement of disputed factual issues set forth in the parties' initial Joint Case Management Statement. Thus while reserving all rights and conceding nothing, with respect only to the exhaustion of tribal remedies issue and no other issues in the case, Defendants principal disputed factual issue is:

> A. Whether the plaintiffs ever presented their grievances raised in this lawsuit, and asked for the relief they seek here, directly to the Tribal Council.

B.

3. **The principal legal issues which the parties dispute:**

**Plaintiffs:**

A. Whether plaintiffs have exhausted their tribal remedies;

B. Whether the Tribe gave notice to plaintiffs of any further Tribal remedies as to their claims;

C. Whether a Tribal Council must ratify a decision of the Board of Directors to honor the Agreements;

D. Whether the Tribe can assert that plaintiffs have not exhausted all tribal remedies if Tribal Council meetings continue to lack quorums;

E. Whether the Board of Directors had the authority to enter into the Agreements;

F. Whether the compensation offered plaintiffs in the Agreements is adequate and legal pursuant to the Indian Civil Rights Act of 1968.

**Defendant Dry Creek Rancheria Band of Pomo Indians:**

Defendants continue to reserve all rights with respect to all issues, including sovereign immunity and plaintiffs' failure to exhaust tribal remedies as raised in the parties' initial Joint Case Management Conference Statement. With respect only to the exhaustion of tribal remedies issues and no other issues in the case, Defendant's principal disputed legal issues include:

A. Whether plaintiffs have exhausted their tribal remedies by presenting their grievances and seeking relief before the Tribal Council;

B. Whether plaintiffs' failure to exhaust their tribal remedies is futile as a matter of law.

**The other factual issues which remain unresolved for the reason stated below and how the parties propose to resolve those issues:**

Plaintiffs' response: None.

Defendant's response: None with respect to the issue of exhaustion of tribal remedies, but reserving all rights as to all issues.

4. **The parties which have not been served and the reasons:**

Individual Board of Directors because action presently stayed. In addition, plaintiffs are considering bringing in causes of action for violation of civil rights pursuant to the Indian Civil Rights Act of 1968.

5. **The additional parties which the below-specified parties intend to join and the intended time frame for such joinder:**

None.

## ALTERNATIVE DISPUTE RESOLUTION

6. **The following parties consent to assignment of this case to a United States Magistrate Judge for jury trial:**

Please refer to previous Joint Case Management Statement.

7. **The parties have already agreed to the following court ADR process:**

Please refer to previous Joint Case Management Statement.

8. **The ADR process to which the parties jointly request referral:**

The parties selected as the best ADR option offered, and this Court ordered, a settlement conference before Magistrate Judge Chen, which conference occurred on October 27, 2006. Subject to the results of the Special Tribal Council meeting scheduled for December 9, 2006, the parties are continuing to confer with Judge Chen concerning possible settlement opportunities and a further settlement conference with Magistrate Judge Chen may be desirable.

## DISCLOSURES

Please refer to previous Joint Case Management Statement.

## DISCOVERY

**9.  The parties agree to the following discovery plan:**

Please refer to previous Joint Case Management Statement.

## TRIAL SCHEDULE

**10.  The parties request a trial date as follows:**

Please refer to previous Joint Case Management Statement.

**11.  The parties expect that the trial will last for the following number of days:**

Please refer to previous Joint Case Management Statement.

Dated: January 3, 2007                /S/ Richard Sax
                                      Law Offices of Richard Sax
                                      Attorneys for Plaintiffs,
                                      Melissa Lorraine Russ; Katherine Marie
                                      Casillas Somersall; and
                                      Yolanda Casillas Somersall


Dated: January 3, 2007                /S/ David M. Gonden
                                      Holland & Knight LLP
                                      Attorneys for Defendant,
                                      Dry Creek Rancheria Band of Pomo Indians

## CASE MANAGEMENT ORDER

The Case Management Statement and Proposed Order is hereby adopted by the Court as the Case Management Order for the case and the parties are ordered to comply with this Order. In addition the Court orders:

Dated: __January 5, 2007_____    _____
Honorable Charles R. Breyer
United States

